763 So.2d 210 (2000)
Rodney JONES, Appellant,
v.
STATE of Mississippi, Appellee.
No. 1999-KA-00310-COA.
Court of Appeals of Mississippi.
June 27, 2000.
Dan W. Duggan, Jr., Brandon, Attorney for Appellant.
Office of the Attorney General by Scott Stuart, Attorneys for Appellee.
BEFORE KING, P.J., PAYNE, AND THOMAS, JJ.
*211 THOMAS, J., for the Court:
¶ 1. Rodney Jones appeals to this Court his conviction of murder in the Hinds County Circuit Court. From that conviction, Jones was sentenced to serve a term of life with the Mississippi Department of Corrections. Feeling aggrieved, Jones assigns four issues of error in his brief to this Court. However, in view of our disposition of this matter we need only address one issue.

WHETHER THE TRIAL COURT ERRED BY ADMITTING INADMISSIBLE HEARSAY EVIDENCE.
¶ 2. Finding error, we reverse and remand.

FACTS
¶ 3. On April 27, 1997, Stacey Brunt was shot once as he sat in his company vehicle on Queen Julianna Street in Jackson, Mississippi. The single bullet from a 9 millimeter did sufficient damage to cause the death of Brunt, having entered and exited both his right leg and then his left leg. It was the opinion of the forensic pathologist that the bullet severed a femoral artery that resulted in Brunt's bleeding to death.
¶ 4. After being shot, Brunt managed to pull himself from his vehicle. As he pulled himself from the vehicle and lay bleeding in the street he began screaming for help. Having heard his pleas for help, several "Good Samaritans" came to Brunt's aid. One particular individual, Benita Alexander, testified that she heard a man screaming for help directly in front of her house and went to his aid. She testified that Brunt told her to get him a towel, so she returned to her home for the towel. When she returned with the towels, additional people had gathered around him trying to render assistance as best they could, applying towels to his wounds, while an ambulance was summoned. Around three to four persons were actively giving aid to Brunt. Alexander testified that she was holding his leg and taking orders from the others who were rendering aid. Another unidentified lady, possibly a nurse, was at Brunt's head. During this time, Alexander heard Brunt state that he thought he was dying and that he wanted his daughter to know that he loved her. Alexander also testified that she had moved to her yard by the time that the ambulance and fire department arrived about twenty minutes later. This much appears not to be in dispute.
¶ 5. It is with the following facts that the witnesses's testimonies begin to diverge. At trial, the State sought to have statements made by Brunt, as he lay wounded and dying in the street, admitted into evidence through Alexander. Alexander was probed on whether Brunt had stated who had shot him along with a description. Alexander's police statement reflected that she had in fact heard Brunt say who had shot him along with a physical description of the suspect. However, at trial Alexander testified differently. She testified that the police statement was partially incorrect. She testified that she was actually told by another bystander, possibly a nurse rendering aid at Brunt's head, what Brunt was saying in response to the questions being put to him, but never heard the words come from Brunt. When asked why her present testimony was inconsistent with her statements made to the police on the day of the shooting and in subsequent interviews, Alexander testified that when she told the police that Brunt had identified "Rodney" as the person who had shot him she meant that she had heard it through the unidentified lady who was at Brunt's head rendering assistance and not from Brunt directly.
¶ 6. Further inconsistencies also arose at trial concerning the events surrounding the shooting. At trial, the State introduced a confession given by Jones, in which Jones confessed to shooting Brunt. Detective Grant Parker of the Jackson Police Department testified to the information contained in the confession. In that confession, Jones indicated that he and *212 Timothy Brown were riding in a green Bonneville, driven by Brown, on the day of the shooting. Jones stated that he and Brown spotted a pest control truck driven by Brunt and that he and Brown signaled Brunt to pull over. Brunt complied. At that point, Jones exited the Bonneville on the passenger side and approached the vehicle driven by Brunt. Jones also stated that he had a Hi-Point 9-millimeter pistol on his person as he approached Brunt. After a brief exchange of words between the two men, Jones stated that he produced the gun, stuck it into the truck cab occupied by Brunt, and pointed it towards the floor board not intending to shoot Brunt, just to scare him because Brunt owed him approximately $300 in drug front money. Jones stated that when he pointed the gun into the truck cab, Brunt hit his hand and the gun discharged one time. Jones then returned to the Bonneville driven by Brown, and the two drove away. When asked if Brown knew if anything was going to happen prior to the shooting or had anything to do with the shooting, Jones stated that Brown did not know anything was going to happen or have anything to do with the shooting. Detective Parker testified that he subsequently interviewed Brown after taking Jones's confession and that Brown confirmed the information provided by Jones. At trial, Brown's testimony was consistent with Jones's confession. Brown testified that it was Jones who had shot Brunt, consistent with Jones's confession, and that they were the only two people in the car at the time of the shooting.
¶ 7. At trial, Jones testified differently than his confession and implicated Brown as the shooter. Jones recanted his earlier confession and testified that his earlier confession was made out of fear that Brown would harm him or his family if he snitched on Brown. Jones testified that in an effort to avoid being labeled a "snitch" and bring possible harm on himself or his family at the hands of Brown, he thought it best to confess to the shooting himself and implicate Brown only as the driver and an unknowing participant. Jones theorized this would cause Brown to be questioned by the detectives and bring feelings of guilt on Brown thus causing him to confess that it was he and not Jones who shot Brunt. Jones testified that this was the only way he could think of to prevent harm to himself or his family for snitching and also cause Brown to admit his wrongdoing.
¶ 8. Jones provided the following version of events at trial. Jones maintained that he, his brother Patrick Jones, and Cedric Studaway were walking down Queen Mary Street when Brown pulled up along side of them asking if they wanted to ride and smoke some marijuana. The three agreed and got into Brown's car. Jones and Patrick got into the back seat, and Brown and Studaway were in the front seats. Jones testified that upon spotting Brunt, they decided to flag him down over drug money debts owed to both him and Brown. Jones got out of the back seat and talked to Brunt about the money owed him while the others remained in the car. However, Jones denied ever shooting Brunt. He testified that he was willing to let Brunt slide on his debt and that he returned to the car to inform Brown that Brunt did not have any money. Jones testified that Brown became angry and sought to extract punishment on Brunt for the debt owed him. Brown approached Brunt's truck, pulled out a Hi-Point 9mm pistol and shot Brunt once. Patrick Jones testified consistently with that testimony provided by his brother at trial with the exception of some inconsistencies concerning Studaway's first name. Both provided separate reasons for not divulging this information earlier. Jones feared harm from Brown, and Patrick stated that he was only "respecting his brother's wishes" not to "snitch" on Brown. Jones stated that he only recently came forward after realizing that Brown was not going to admit his guilt.
*213 ¶ 9. Jones further alleged that while he was being interviewed by Detective Parker and Detective Brent Winstead, also of the Jackson Police Department, another police officer, Sergeant Clifton Paige, participated in the interview. Jones testified that he knew Sergeant Paige from the neighborhood and that both Detectives Parker and Winstead left the room while he and Sergeant Paige conversed privately. Jones alleges that Sergeant Paige promised to put in a good word and get him a good deal if he confessed to the shooting. At trial, Jones also alleged that Detective Winstead slapped him a few times during the interview. The officers denied that any promises had been made or that violence had been used during the interview, and the trial court, having held a pretrial hearing on that matter, concluded that the confession was admissible.

WHETHER THE TRIAL COURT ERRED BY ADMITTING INADMISSIBLE HEARSAY EVIDENCE.
¶ 10. Jones assigns as error the trial court's failure to curtail or prevent the State's introduction of inadmissible hearsay testimony through Alexander. Jones argues that in so allowing the State to proceed in eliciting testimony from Alexander concerning alleged statements made by Brunt naming "Rodney" as the shooter, he was denied his fundamental right to a fair trial. The State contends that the statements were admissible hearsay statements under the dying declaration and excited utterance exceptions of the Mississippi Rules of Evidence, Rules 804(b)(2) and 803(2) respectively.
¶ 11. The State submits that both instances of the relayed statements at issue fall under exceptions to the hearsay rule and that the proper foundation was laid prior to admitting said statements. The State argues that as Brunt lay mortally wounded awaiting an ambulance he expressed a fear of dying, or impending death as a result of his injuries, as he went in and out of consciousness. The State submits that the statements made by Brunt to the "other lady" during this time, in which Brunt named the shooter as "Rodney," clearly meets the dying declaration exception of the hearsay rule. The State argues in support of its argument that despite Brunt's original desire to leave the scene immediately following his injury, he soon realized the extent of his injuries as life threatening and that he wanted his daughter to know that he loved her. In light of the developments at trial, specifically the testimony provided by Alexander on this issue, the State argues on appeal that the second relay of the dying declaration from the "other lady"to Alexander likewise meets a permissible exception to the hearsay rule under the excited utterance exception. It is contended by the State that the "other lady" relaying what Brunt was saying had neither the time nor the motive to stop and reflect upon the consequences of telling anything but the truth.
¶ 12. We turn to those portions of Alexander's testimony relevant to our resolving this issue. On direct examination by the State, Alexander was asked if she recalled what she had told the police offices regarding the shooting.
Q. What did you tell them when they asked you about the shooting?
A. Well, I told them that we were all standing around trying to help him and that we was asking him questions, and he was telling us, you know, who shot him and all these different type of questions, but the thing about that is that
Q. If you would, just tell us what you told them when they askedwhen you asked him who shot him, what did you tell the officers he said?
A. Well, I told them that he said that Rodney shot him.
Q. And you said we asked him if Rodney was white or black, and what answer did you get?
A. He said he was black.

*214 * * *
Q. And what else did you say [Brunt] said? Would it help to refresh your memory to read it from your statement?
* * *
A. When I got to the white guy, another black female that I don't know, I think she was driving by, was already therealready with the guy. We asked the white guy who shot him, and he replied, Rodney shot me. While we askedwe asked him if Rodney was white or black, and he said black. We asked him what his name was, and he said Stacey.
* * *
Q. All right. Now, is that a correct statement of what happened that night?
A. Yes and no.
Q. Explain that if you would.
A. Well, because of the simple fact that I did not ask the questions. It did not come directly from me tohis answers did not come directly to me.
Q. How did his answers come?
A. From the lady that was asking him the questions. She was telling us what he had said.
* * *
Q. And so now you are saying that's not correct?
A. Well, I'm saying that it didn't come fromI didn't hear him say it. I was told that he said it from the other lady that was asking questions.
* * *
Q. Now, tell us what's not accurate that's in this statement that says that you all asked him who shot him and he said Rodney. What's not accurate?
A. Well, everybody didn't ask the questions. Only one lady asked the questions.
Q. Okay.
A And she gave usI mean she told us what he said. She gave us the information.
Q. How long did it take for her to tell you what he said?
A. I mean I'm guessing that she was telling us directly. I'm not quite
* * *
Q. Okay. But you heard the name Rodney while you were there kneeling; is that correct?
A. From her, yes.
This testimony was allowed to be presented before the jury over timely defense objection.
¶ 13. In ruling on the admissibility of the statements once the State made its motion to have the statements admitted following foundation testimony for admitting a dying declaration exception, the trial court overruled Jones's objection and held that the statements being sought for admission qualified not only under the dying declaration exception of M.R.E. Rule 804(b)(2), but also the excited utterance exception of M.R.E. Rule 803(2). Once it became apparent that Alexander was testifying not to what she actually heard from Brunt but what was being relayed from Brunt to her through the "other lady," defense counsel made repeated objections and was granted a continuing objection. In arguing for the admission of the nurse's statement to Alexander, the State submitted to the trial court that Alexander's prior statements to the detectives should be admissible for impeachment purposes given Alexander's testimony at trial. However, Alexander was the only witness offered by the State that was present at the scene during the time when Brunt made the *215 alleged statements and therefore her testimony is vital. Under these circumstances any argument based on impeachment grounds is for naught since the content in Alexander's prior statements was based on hearsay and was clearly were being offered for their truth rather than for impeachment purposes.
¶ 14. There is in this case a questionable matter of double hearsay or hearsay upon hearsay. Our rules of evidence declare that: "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." M.R.E. Rule 805. Thus, if each leg of the hearsay upon hearsay conforms with an exception to the hearsay rule, the double hearsay is admissible. The difficulty in this case is that the sole witness available at trial, Alexander, who readily and repeatedly denied at trial ever actually hearing the deceased declarant state that "Rodney" was the person who shot him, was allowed to testify and have two separate relays of hearsay testimony admitted through her testimony. What Alexander did testify to was having heard statements made by the deceased declarant that he "may be dying and that he wanted to tell his daughter that he loved her." This is the sort of testimony directed at laying a predicate foundation to admit a dying declaration under our rules of evidence.
Rule 804(b)(2) is our codified rule on dying declarations and provides as follows:
(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
* * *
(2) Statement Under Belief of Impending Death. In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that his death imminent, concerning the cause or circumstances of what he believed to be his impending death.
¶ 15. While Alexander's testimony concerning Brunt's belief of dying and love of his daughter is admissible in establishing the necessary foundation to have the deceased declarant's utterances admitted under the dying declaration exception of the hearsay rule, what Alexander actually heard about who shot Brunt came not from the decedent but from the "other lady" who in essence acted as a verbal conduit of the dying victim. The State seeks to have all of the hearsay evidence admitted through the sole testimony of Alexander despite her having heard part from Brunt. In this case, given the surrounding circumstances, it was fatal to the State's case in seeking to have Brunt's dying declaration admitted through a witness who obviously did not hear the declaration from Brunt. Nor do we find that Alexander's testimony that those who were giving aid were "excited" is curative of the error in this case.
¶ 16. Without the dying declaration the jury was faced with two scenarios. If they believed Jones's confession was true, as corroborated by Brown's trial testimony, then Jones was guilty. However, if they believed Jones's trial testimony, as supported by his brother, then obviously the jury would had to have returned a verdict of not guilty. The dying declaration thus becomes crucial. The trial court held the deceased statement's admissible as a dying declaration or excited utterance. It never specifically addressed the issue of hearsay on hearsay once Alexander's testimony revealed that she, in fact, never heard Brunt state who had shot him.
¶ 17. As to the statements Alexander actually heard Brunt make, we agree with the trial court that they were admissible as foundation testimony in establishing a dying declaration. However, the trial court never made any specific findings or ruled specifically on the double hearsay problem, the nurse's statement's to Alexander. Without more, we are compelled to hold that the admission of the statements by *216 the nurse to Alexander was error and reversible error in this case, given the obvious impact the statements would naturally have on a jury.
¶ 18. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE TAXED TO HINDS COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, IRVING, MOORE, AND PAYNE, JJ., CONCUR. LEE, J., NOT PARTICIPATING.