905 So.2d 678 (2004)
Blaine BROOKS, Appellant
v.
STATE of Mississippi, Appellee.
No. 2001-KA-01826-COA.
Court of Appeals of Mississippi.
June 29, 2004.
Rehearing Denied September 7, 2004.
*680 Paul McGerald Luckett, Mccomb, Richard M. Goldwasser, attorneys for appellant.
Office of the Attorney General by W. Glenn Watts, attorney for appellee.
EN BANC.
LEE, J., for the Court.

PROCEDURAL HISTORY
¶ 1. On October 9, 2001, Blaine Brooks was convicted of murder by a jury in the Pike County Circuit Court. Brooks was sentenced to life in prison to be served in the custody of the Mississippi Department of Corrections. Brooks now files an appeal to this Court, asserting that the trial court erred in the following ways: (1) by denying his motion to bar identification testimony; (2) by allowing hearsay testimony; (3) by allowing evidence of gang activity at trial; and (4) by denying his motions for a directed verdict and a judgment *681 notwithstanding the verdict because the State failed to prove his guilt beyond a reasonable doubt.

FACTS
¶ 2. On May 17, 1999, Merry Wilson was found dead in her home. Wilson died as a result of multiple stab wounds inflicted by a two-pronged fork which was recovered from her throat. The pathologist testified that Wilson had probably died sometime between the twelfth and the fifteenth of May. Wilson had also recently inherited $10,000 and her bed and mattress had been ransacked.
¶ 3. A neighbor, Sandra Graham, stated that she had seen an African American male leaving the victim's home in the early morning of May 13. During a photographic line-up, Graham identified Brooks as the man leaving Wilson's home that morning. Prior to this, Brooks's mother, Towanda Nobles, had told her half-sister, Sherry Maxine Hodges Smith, that Brooks told her that he had stabbed Wilson. After Smith reported this statement to the police, neither Brooks nor Nobles could be located. Brooks had taken a bus to Chicago on May 14th. Brooks was arrested in Chicago in July 2000 and extradited to Mississippi in February 2001. There was a line-up at the jail, where Graham again identified Brooks as the man she had seen leaving Wilson's home the morning of May 13th.

DISCUSSION OF ISSUES

I. DID THE TRIAL COURT ERR IN DENYING BROOKS'S MOTION TO BAR IDENTIFICATION TESTIMONY?
¶ 4. In his first issue, Brooks contends that the trial court erred in denying his motion to bar identification testimony. In his brief, Brooks breaks down this issue into separate arguments which we have condensed as follows: the photographic line-up was impermissibly suggestive, thus it was error to introduce Graham's identification of him into evidence; and his Sixth Amendment right to counsel was violated at the pretrial line-up, thus it was error to introduce into evidence Graham's identification of him at the line-up.

a. Was the photographic line-up impermissibly suggestive thus tainting Graham's in-court identification?
¶ 5. In this argument Brooks contends that the photographic line-up was so suggestive as to taint Graham's in-court identification of him at trial. Brooks also argues that it was error to introduce Graham's identification of him into evidence. An in-court identification is not subject to suppression unless it is shown to have been tainted by some suggestive out-of-court identification. Smith v. State, 430 So.2d 406, 407 (Miss.1983). If there is substantial credible evidence to support the trial court's finding that the in-court identification testimony has not been impermissibly tainted, this Court may not reverse the trial court's findings. Nicholson v. State, 523 So.2d 68, 71 (Miss.1988). We must review the trial court's decision based upon the totality of the circumstances. Id.
¶ 6. The photographic line-up in question consisted of three photographs taken from the room where Brooks had been staying before leaving for Chicago. Officer Holmes testified that he had no mug shots of Brooks available to show Graham because they were unsure of his name, only his alias "Robert Kemp." Two of the photographs depicted two men and a woman, while the other was of a man and a woman. At this "line-up" Officer Holmes testified that he simply asked Graham if one of the pictures contained the man she saw leaving Wilson's home and she said "yes."
*682 ¶ 7. The Mississippi Supreme Court set out the appropriate standards of review for allegedly improper identifications of a defendant in York v. State, 413 So.2d 1372, 1383 (Miss.1982). The court held:
Only pretrial identifications which are suggestive, without necessity for conducting them in such manner, are proscribed. A lineup or series of photographs in which the accused, when compared with the others, is conspicuously singled out in some manner from the others, either from appearance or statements by an officer, is impermissibly suggestive.
* * *
An impermissibly suggestive pretrial identification does not preclude in-court identification by an eyewitness who viewed the suspect at the procedure, unless (1) from the totality of the circumstances surrounding it (2) the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Even if testimony is proferred of the out-of-court identification itself, the same standard exists as to the above, with the omission of the word "irreparable."
Id. The five factors in determining whether there was a substantial likelihood of misidentification are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the sighting and the confrontation. Id.
¶ 8.(1) Opportunity to view. Graham testified that she was walking on the side of the road when she saw Brooks leave Wilson's house and get into the passenger seat of the vehicle. When the vehicle passed Graham, she was on the same side of the vehicle as Brooks. The trial court found that Graham had ample opportunity to look and that she was in close proximity.
¶ 9.(2) Witness's degree of attention. Graham testified that it was highly unusual for there to be any activity at that time of the morning. Graham noted that she walked by the house every morning and never saw much activity. The trial court determined that Graham's specific notice of the unusualness of the situation explains the amount of attention she gave to watching Brooks.
¶ 10.(3) Accuracy of the witness's prior description of the criminal. Although Graham was not able to give a specific description of Brooks, such as his height, weight, or build, she testified that she got a good look at his face, especially his profile, his hair, and the protrusion of his lips. Graham stated that she saw an African American male who was dark skinned, even though Brooks turned out to be lighter skinned than she remembered.
¶ 11.(4) Level of certainty demonstrated by the witness at the confrontation. Graham testified that she identified Brooks based upon her memory of what he looked like that morning rather than based upon any suggestions or photographs. Graham stated that she had no doubt in her mind that Brooks was the person she saw exiting Wilson's home that morning. The trial court noted that there was nothing uncertain in Graham's description of Brooks that morning.
¶ 12.(5) Time between the sighting and the confrontation. Graham viewed the photographs on May 25, twelve days after originally seeing Brooks exit Wilson's home.
¶ 13. Were we to find that the photographic line-up was suggestive, which we *683 do not, we still find that the in-court identification of Brooks was positive, based on Graham's opportunity to view Brooks immediately after the crime, and accordingly reliable. There was substantial credible evidence that under the totality of the circumstances there was no substantial likelihood of misidentification. Thus, the trial court did not commit error in allowing the in-court identification.

b. Was Brooks's Sixth Amendment right to counsel violated at the line-up, thus tainting Graham's identification of him at the line-up?
¶ 14. In this argument, Brooks complains that his Sixth Amendment right to counsel was violated during the line-up. Brooks also argues that because the line-up was impermissible, the in-court identification should not have been allowed. Under the Sixth Amendment to the United States Constitution and Article Three, Section 26 of the Mississippi Constitution of 1890, an accused has a right to counsel during accusatory proceedings. Ormond v. State, 599 So.2d 951, 956 (Miss. 1992). The accusatory stage may commence when a warrant is issued or, "by binding over or recognizing the offender to compel his appearance to answer the offense, as well as by indictment or affidavit." Miss.Code Ann. § 99-1-7 (Rev.2000).
¶ 15. In some cases, the supreme court has held that an accused has the right to have counsel present during a line-up only after adversarial proceedings have been initiated. Wilson v. State, 574 So.2d 1324, 1326 (Miss.1990) (citing Magee v. State, 542 So.2d 228, 233 (Miss.1989); Jimpson v. State, 532 So.2d 985, 989 (Miss. 1988)). The right "attaches after arrest and at the point when the initial appearance `ought to have been held.'" Id. (quoting Jimpson, 532 So.2d at 988). Denial of the right to counsel "will result in reversal of a subsequent conviction only where it is shown that the accused experienced some untoward consequence flowing directly from denial of counsel." Wright v. State, 512 So.2d 679, 681 (Miss.1987).
¶ 16. Although Brooks was not indicted or arraigned until months after the line-up, an arrest warrant had already been issued as well as a criminal affidavit. Thus, adversarial proceedings had already commenced by the time of the line-up and Brooks was entitled to counsel. However, according to the record, Brooks neither asked for counsel once given the opportunity nor did he refuse to participate in the line-up after given the option of whether to participate. In Magee v. State, 542 So.2d 228 (Miss.1989), the supreme court found that assuming Magee's right to counsel at a line-up was violated gained him nothing. The opinion states:
Mrs. Simmons did not identify Magee at the lineup. Moreover, as we have held above, Mrs. Simmons' in-court identification testimony was not impermissibly tainted by anything that occurred at the lineup. Accordingly, the technical violation of Magee's right to counsel at his lineup becomes harmless constitutional error beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 21, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, 709 (1967); Jimpson v. State, 532 So.2d at 989.
Id. at 233. The court in Jimpson also found that Jimpson's right to counsel had been violated, but that "the error is harmless for there is no sufficient showing in the record that the identification testimony was impermissibly tainted by the line-up being held without the presence of legal counsel." Jimpson, 532 So.2d at 989. There are factual differences between Magee and this case; however, they are of no importance because Brooks does not argue that the line-up in which he was included was so constituted, arranged, or presented *684 to Graham that her in-court identification of him was impermissibly tainted. Brooks merely argues that he was denied counsel at the line-up ergo Graham's identification testimony is faulty. There is nothing in the record to suggest that the line-up was impermissibly suggestive. Graham viewed Brooks leaving the crime scene and was able to get a good look at his face. Graham also identified Brooks independently of the line-up. We have already determined supra that there was little likelihood of misidentification of Brooks by Graham.
¶ 17. We conclude that the trial court committed no error in admitting evidence of Graham's identification of Brooks through photographs and a line-up, even though Brooks was not represented by counsel at the time of the line-up.

II. DID THE TRIAL COURT ERR IN ALLOWING HEARSAY TESTIMONY?
¶ 18. In his second issue, Brooks contends that the trial court erred in denying his motion to bar the hearsay statement attributed to Nobles and repeated by Smith. Trial courts, at their discretion, determine the competency of excited utterances. Stokes v. State, 797 So.2d 381(¶ 14) (Miss.Ct.App.2001). Mississippi Rule of Evidence 801(c) defines hearsay as a statement "offered into evidence to prove the truth of the matter asserted." Mississippi Rule of Evidence 803(2) provides for an exception to the exclusion of hearsay evidence, namely that a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule. It is important that there has been no intervening matter to eliminate the state of excitement and call into question the reliability of the utterance. Berry v. State, 611 So.2d 924, 926 (Miss.1992).
¶ 19. Smith testified that Nobles came to her on May 16, 1999, and she was visibly upset. Nobles was crying and stated that she was depressed. After Nobles stated to Smith that "It's done happened," Smith testified that Nobles "grabbed my neck and broke down and went crying. She said, `She dead.' I said, `Who?' And she didn't want to say right then and she said, `Merry'." Nobles kept crying and then told Smith that Blaine did it. Smith then stated as follows:
Q: Okay. What did she tell you? What did she  what else did she tell you about what Blaine had done?
A: She said Blaine had stabbed her. Stabbed Marry [sic]. Said they got into an argument and Blaine stabbed her. They said Blaine left and come where she was. She was on her job. That Blaine come on her job to tell her about it. And said he had bloody clothes. And she told them to get those bloody clothes out of there and get rid of them. And say he left. And I said where is Blaine now? She say he's gone. He's in Chicago.
Smith further testified that Nobles loved Brooks and that they were close. We note that, after obtaining information that Nobles helped Brooks flee to Chicago and that she told him to dispose of the bloody clothes, Officer Holmes decided to issue a warrant for Nobles's arrest charging her with accessory after the fact. Nobles later left for Chicago as well and had not returned or been seen by Officer Holmes or Smith by the time of the trial.
¶ 20. At the motion hearing concerning the statements made to Smith by Nobles, the trial court stated as follows:
Common sense tells us if we had a child that came to our job, with bloody clothes on, and on top of other bloody clothes, and confessed to stabbing somebody, *685 would be a startling event. The essential element is spontaneity. With respect to the time element, the issue of the duration of the excited statement. On the face of the statement itself, she tells what her condition is. She tells what her sister's condition is. There's no doubt about it being an excited utterance.
No doubt that Towanda Nobles being under the distress of excitement caused by the event. Lord knows what would happen if your daughter or your son came to you on the job and had bloody clothes on and clothes on top of bloody clothes....
Ms. Towanda said that he was very upset and very emotional. Says he's done it again. Mr. Holmes said that details revealed in the statement were consistent with things discovered in the investigation....
I thinkI think it's admissible under the excited utterance exception....
I think it's also admissible under the 803(24) other exception. In view of the time and content of the statement, the circumstances of the event. I think they all provide substantial indicia of reliability to overrule your normal concerns of unsworn hearsay statement. And I make such a finding.
I think it has sufficient guarantee of reliability and trustworthiness.... Certainly there's been no motive, suggestion of any motive. It would be normal for a mother, a fairly decent mother to do to her sister, if something of this nature happened.... There'd be no reason for the sister to make such an event or an account up.... So I find that the statement is admissible under 803(2) and (24).
¶ 21. As there was sufficient testimony to show that Nobles was upset and hysterical when confessing to Smith what her son had done, we cannot find that the trial court abused its discretion in admitting the statement.
¶ 22. We do note that Brooks's statement to Nobles, as repeated to Smith, is considered hearsay within hearsay. However, pursuant to Mississippi Rule of Evidence 805, "hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule...." As Brooks was entitled to his privilege against self-incrimination, he could be considered unavailable to testify according to Mississippi Rule of Evidence 804(a)(1). Therefore, under Mississippi Rule of Evidence 804(b)(3), Brooks's confession to his mother is a statement against interest and allowed into evidence. A statement against interest is "a statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true...." M.R.E. 804(b)(3). We find Brooks's statement to his mother was properly allowed into evidence.
¶ 23. Brooks also calls our attention to a recent Supreme Court decision to support his argument that Nobles's statement to Smith was inadmissible. In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the defendant's wife made a statement to the police during an interrogation regarding the defendant's stabbing of a victim. The wife did not testify at trial because of the state marital privilege, but her tape-recorded statements during the interrogation were introduced and played for the jury. The Supreme Court reversed, holding that out-of-court statements by witnesses that are testimonial are barred, under the Confrontation *686 Clause, unless witnesses are unavailable and defendants had prior opportunity to cross-examine witnesses, regardless whether such statements are deemed reliable by court. Although the Supreme Court declined to further define "testimonial," the Court stated that it applied "to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Id at 1374. However, in the case sub judice, Nobles, under great distress, told Smith what Brooks had told her. We fail to see how Nobles's statement to Smith would be considered testimonial, thus raising Sixth Amendment concerns.

III. DID THE TRIAL COURT ERR IN ALLOWING EVIDENCE OF GANG ACTIVITY AT TRIAL?
¶ 24. In his third issue, Brooks contends that the trial court erred in allowing the State to present evidence of Brooks's involvement in gang activity as a possible theory for its case. Prior to trial, Brooks filed a motion in limine to prevent the State from introducing evidence of his alleged involvement in gang activity. The State opposed saying that evidence of gang activity, especially concerning the choice of murder weapon, was important to show motive. The trial court allowed the evidence stating: "I'm going to let it in, yes. I'm going to let them, this fork, and let the jury decide whether this fork represents aif that's the testimony, then I'm going to let the jury decide whether or not the fork represents a pitchfork."
¶ 25. "A trial judge is allowed considerable discretion as to the relevancy and admissibility of evidence and, unless his judicial discretion is abused, this Court will not reverse his ruling." Edwards v. State, 737 So.2d 275(¶ 59) (Miss.1999) (citations omitted). The Fifth Circuit applies the two-pronged Beechum test to determine the admissibility of extrinsic evidence under Rule 404(b). United States v. Beechum, 582 F.2d 898, 911 (5th Cir.1978). First, a determination must be made that the evidence is relevant to an issue other than the character of the defendant. Crawford v. State, 754 So.2d 1211(¶ 23) (Miss.2000). Second, the probative value of the evidence must not be outweighed by the danger of unfair prejudice. Id.
¶ 26. Mississippi Rule of Evidence 404(b) provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Although gang activity or membership can be relevant under Mississippi Rules of Evidence 404(b), it also has the potential to be very damaging to the jury. Hoops v. State, 681 So.2d 521, 530 (Miss.1996). Trial courts must be cautioned to take care when reviewing such evidence and "to ensure that no unfair prejudice accrues to a defendant, a trial judge should administer the balancing test of Rule 403 under the Mississippi Rules of Evidence before admitting such evidence into the trial." Id. In Hoops, the supreme court found that, "while the trial judge failed to use the `magic words' that he did not find the danger of unfair prejudice to substantially outweigh the probative value of his evidence, he implicitly made that determination." Id. at 531. Here, we find the same.
¶ 27. The State offered the evidence of Brooks's gang involvement to prove identity of the person who murdered the victim. This purpose is permissible under Rule 404(b). In order to prove that the extrinsic evidence of gang activity was relevant to an issue other than character, *687 the State showed that the pitchfork gang symbol and the choice of the large meat fork as the murder weapon were too similar to be coincidental. The meat fork was chosen as a weapon even though Wilson's home had a kitchen well stocked with knives and other utensils. The State introduced drawings found in Brooks's room which depicted, among other things, a six-pointed star with pitchforks pointing up. The jury was also shown a tattoo on Brooks's shoulder which showed a faceless grim reaper with a pitchfork coming straight up in front of the body. Testimony from the expert witness familiar with gang activity revealed that the pitchfork and a six-pointed star were symbols affiliated with the gang in which Brooks admitted he had been involved.
¶ 28. The expert also testified about the significance of the placement of the pitchfork. A pitchfork in the upright position signifies respect, while a pitchfork in the downward position signifies disrespect. Brooks attempts to argue that since the pitchfork was pointing down in Wilson's neck, he is absolved from responsibility because a gang member would not disrespect his own gang. We must keep in mind that the expert witness communicated information regarding the placement of the pitchfork in graffiti, tattoos, and the flashing of the gang symbol. The expert further testified that he cannot make a determination as to the way gangs carry out homicides.
¶ 29. In reviewing the photographs of the crime scene, the handle of the pitchfork is sticking straight out of Wilson's neck. Suffice it to say that the emotion involved in stabbing a victim some thirty times with a meat fork with enough forcefulness to break a prong would not lend itself to carefully taking the time and emotional coolness to place the fork in a position of deference indicating gang allegiance. Also, the fact that the weapon was broken may have had some significance as to the final placement.
¶ 30. It has been proven that gangs employ certain means of being identified. See Eldridge v. State, 764 So.2d 515(¶ 11) (Miss.Ct.App.2000) (gang symbols used in letter); Street v. State, 754 So.2d 497(¶ 14) (Miss.Ct.App.1999) (gang members in photos displaying gang symbols and signs); Hoops, 681 So.2d at 532 (significance of designated colors for gang membership). In view of the descriptions of behavior and activity by known gang members, it is not too attenuated to believe that there is a connection between the weapon of choice used to kill the victim, here a two-pronged meat fork, and the gang symbol, a pitchfork. Accordingly, we find that the admission of gang activity was not an abuse of judicial discretion.

IV. DID THE TRIAL COURT ERR IN DENYING BROOKS'S MOTION FOR A DIRECTED VERDICT AND A JUDGMENT NOTWITHSTANDING THE VERDICT BECAUSE THE STATE FAILED TO PROVE HIM GUILTY BEYOND A REASONABLE DOUBT?
¶ 31. In his last issue, Brooks contends that the trial court erred in denying his motion for a directed verdict and a judgment notwithstanding the verdict because the State failed to prove him guilty beyond a reasonable doubt. Brooks mainly argues that the lack of physical evidence linking him to the crime was sufficient for the jury to find him not guilty. Our standard of review concerning sufficiency of the evidence is as follows: the trial judge is required to accept as true all of the evidence favorable to the State, including any reasonable inferences that may be drawn therefrom. Wall v. State, 718 So.2d 1107(¶ 15) (Miss.1998). If, under this standard, *688 sufficient evidence to support the jury's verdict of guilty exists, the motion for a directed verdict should be denied. Isaac v. State, 645 So.2d 903, 907 (Miss. 1994). The court will reverse only when reasonable and fair-minded jurors could only find the accused not guilty. Wetz v. State, 503 So.2d 803, 808 (Miss.1987). It is within the discretion of the jury to accept or reject testimony by a witness, and the jury "may give consideration to all inferences flowing from the testimony." Mangum v. State, 762 So.2d 337(¶ 12) (Miss. 2000) (quoting Grooms v. State, 357 So.2d 292, 295 (Miss.1978)).
¶ 32. In accepting together as true all evidence favorable to the State, including reasonable inferences, we cannot find that reasonable and fair-minded jurors could only find Brooks not guilty. Graham testified that she saw Brooks leave Wilson's home and was able to clearly identify him at trial more than two years after the murder. Brooks's mother told Smith that her son had killed someone and that she told him to get rid of his bloody clothes. There was evidence linking the murder weapon to a gang tattoo on Brooks's shoulder. There was testimony that Brooks fled to Chicago immediately after the murder and that his mother joined him shortly thereafter. Although there was no direct physical evidence, we find that there was sufficient evidence for a jury to find Brooks guilty; thus, this issue is without merit.
¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF PIKE COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT THE POSSIBILITY OF PAROLE, EARLY RELEASE, OR PROBATION UNTIL HE REACHES SIXTY-FIVE YEARS OF AGE AND ORDER TO PAY A $10,000 FINE, AND FULL RESTITUTION IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO PIKE COUNTY.
BRIDGES, P.J., MYERS AND CHANDLER, JJ., CONCUR. IRVING, J., DISSENTS WITHOUT A SEPARATE WRITTEN OPINION. KING, C.J., CONCURS WITH A SEPARATE WRITTEN OPINION JOINED BY BRIDGES, P.J., AND JOINED IN PART BY IRVING, J. SOUTHWICK, P.J., CONCURS WITH A SEPARATE WRITTEN OPINION JOINED BY THOMAS AND GRIFFIS, JJ.
KING, C.J., Concurring:
¶ 34. I concur in the result reached, but write separately because I believe the majority's basis for the admissibility of this double hearsay testimony to be wrong.
¶ 35. Hearsay, under M.R.E. 801(c) is defined as a statement other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted.
¶ 36. Over the defendant's objections, the trial court allowed Maxine Hodges Smith to testify (1) that Towanda Nobles told her (Smith), (2) that she (Nobles) had been told by her son (Blaine Brooks), (3) that he killed Merry Wilson. The sole reason for the admission of Smith's testimony was to prove that Blaine Brooks had killed Merry Wilson. Smith's testimony is therefore classic hearsay to the second degree, since it is predicated upon what Blaine Brooks allegedly told Towanda Nobles, who in turn is alleged to have relayed Blaine Brooks alleged statement to Smith. Smith makes no pretense of having observed Blaine Brooks kill Merry Wilson, or of having been told by him that he had killed Merry Wilson. Nor does Smith testify, or even imply, that Nobles was a *689 participant in, or an observer of the ultimate act which the State sought to prove through her testimony. That ultimate act was that Brooks killed Merry Wilson. Towanda Nobles, mother of Brooks, neither testified nor appeared at the trial.
¶ 37. Hearsay is admissible provided it falls within one of the exceptions of M.R.E. 803, general exceptions to the hearsay rule, or 804, exceptions to hearsay where the declarant is unavailable. Likewise under M.R. E. 805, double hearsay may be admissible provided each portion falls within one of the exceptions of M.R. E. 803 or 804.
¶ 38. The majority and the trial court justify admission of Smith's double hearsay under M.R. E. 803(2) and 804(b)(3). These Rules provide:
M.R.E. 803 Hearsay Exceptions; Availability of Declarant Immaterial. The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
(2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
M.R.E. 804 Hearsay Exceptions; Declarant Unavailable. (b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
(3) Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
¶ 39. An excited utterance must (1) be reasonably contemporaneous, (2) spontaneous and reasonably unsolicited, (3) arise out of or be `related' to the event which is the subject of the utterance, and (4) be made by someone, who either participated in the event, or observed the event. Smith v. State, 733 So.2d 793, 798(¶ 18) (Miss.1999); Sanders v. State, 586 So.2d 792, 795 (Miss.1991).
¶ 40. The remarks attributed to Towanda Nobles were not reasonably contemporaneous. According to the testimony of Dr. Steve Hayne, the State's pathologist, Merry Wilson's death was consistent with a date of May 13. Towanda Nobles alleged remarks were made on May 16, some two to three days after the event giving rise to the ultimate fact attempted to be proven through hearsay. That ultimate fact to be proven was that Brooks killed Merry Wilson.
¶ 41. Towanda Nobles' statement was not spontaneous and unsolicited. This lack of spontaneity and solicitation can be seen in the testimony of Smith. Smith testified as follows:
DIRECT EXAMINATION BY MR. BATES OF MAXINE HODGES SMITH
Q. Would you tell the ladies and gentlemenI want you to look at the jury, so that they can hear you and talk loud enough so those folks on the back row can hear you. Tell us what happened. I mean how she got to yourfirst of all, how did she get to your house?
A. Her and Shanta came.
Q. Okay. Did Shanta stay at the house?

*690 A. She stayed there for a few minutes.
Q. Okay. Did Shanta and Towandawell, just tell us what happened.
A. She came in and I was she was sitting down and she told me she needed to talk, she was depressed.
Q. She was what?
A. Depressed.
Q. Okay. How would you describe her, at that time? What was she like, at that time?
A. She was crying.
Q. And what didwould you tell us what she told you?
A. She told me she was depressed. It's done happened.
Q. That something had happened?
A. Uh-huh. And I asked her what happened. And she said she didn't want to talk right now.
Q. Okay.
A. I saidshe grabbed my neck and broke down and went to crying. She said, "She dead." I said, "Who?" And She didn't want to say right then and she said, "Merry."
Q. What happened then, Ms. Hodges?
A. So we just sat around
Q. I'm sorry you have to speak so
A. We sat around. And she was talking. I was talking. And she was crying. I was crying. And then Shanta left.
Q. Okay. Did she tell youwhat, if anything, did she say about Blaine Brooks?
A. She said Blaine did it.
Q. I can't hear you?
A. She said Blaine did it.
Q. Okay. What did she tell you? What did shewhat else did she tell you about what Blaine had done?
A. She said Blaine had stabbed her. Stabbed Merry. Said they got into an argument and Blaine stabbed her. They said Blaine left and come where she was. She was on her job. That Blaine come on her job to tell her about it. And said he had bloody clothes. And she told them to get those bloody clothes out of there and get rid of them. And say he left. And I said where is Blaine now? She say he's gone. He's in Chicago.
Q. Mrs. Hodges, did she tell youdid she tell you why Blaine had gone to Merry Wilson's house?
A. To get his hair braided.
¶ 42. Towanda Nobles' alleged statement did not arise out of the event which was the subject of the utterance. That event being the killing of Merry Wilson. But most importantly, Towanda Nobles was neither a participant in, nor an observer of the event of the utterance that being the killing of Merry Wilson. These statements would therefore not qualify as an excited utterance.
¶ 43. This matter was spoken to by this Court in Jones v. State, 763 So.2d 210 (Miss.Ct.App.2000).
In Jones, the State, through double hearsay, attempted to introduce the dying declaration of a shooting victim as to the identity of his assailant. In reversing Jones' conviction, this Court stated:
While Alexander's testimony concerning Brunt's belief of dying and love of his daughter is admissible in establishing the necessary foundation to have the deceased declarant's utterances admitted under the dying declaration exception of the hearsay rule, what Alexander actually heard about who shot Brunt came not from the decedent but from the "other lady" who in essence acted as a verbal conduit of the dying victim. *691 The State seeks to have all of the hearsay evidence admitted through the sole testimony of Alexander despite her having heard part from Brunt. In this case, given the surrounding circumstances, it was fatal to the State's case in seeking to have Brunt's dying declaration admitted through a witness who obviously did not hear the declaration from Brunt. Nor do we find that Alexander's testimony that those who were giving aid were "excited" is curative of the error in this case.
Id. at (¶ 15).
¶ 44. Smith testified that Nobles described herself as depressed. Depressed and excited are mutually exclusive terms. An individual who is depressed is described as being low in spirits or dejected. Whereas an individual who is excited is described as emotionally aroused or stirred. The American Heritage Dictionary (3rd ed.1992). Depressed and excited define conditions which are polar opposites. Being polar opposites, they are mutually exclusive.
¶ 45. Clearly Towanda Nobles' statement that Blaine Brooks told her that he had killed Merry Wilson was not an excited utterance as envisioned by M.R.E. 803(2) and should not have been allowed thereunder.
¶ 46. It would appear that the trial judge as almost an afterthought found this evidence to be admissible under the catchall of M.R.E. 803(24). Hentz v. State, 542 So.2d 914, 918 (Miss.1989).
¶ 47. Because we review this decision under an abuse of discretion standard, Sanders v. State, 757 So.2d 1022(¶ 5) (Miss.Ct.App.2000), the trial judge's almost afterthought is entitled to be affirmed.
BRIDGES, P.J., JOINS THIS OPINION. IRVING, J., JOINS IN PART.
SOUTHWICK, P.J., Concurring:
¶ 48. The majority finds that a hearsay statement was properly admitted as an excited utterance. I respectfully disagree. However, the trial judge ruled in the alternative that the statement conformed to the exception for "residual hearsay," which is a general category of hearsay with guarantees of trustworthiness that are equivalent to the recognized exceptions. I find that basis for admission to be valid and therefore concur in affirming.
¶ 49. Brooks contends that the trial court erred in denying his motion to bar a significant hearsay statement. Hearsay is a statement "offered into evidence to prove the truth of the matter asserted." M.R.E. 801(c). I will examine the statement, and then determine whether any exception applied.
¶ 50. Maxine Hodges Smith testified that Brooks's mother (who was Smith's half-sister) came to her on May 16, 1999. Brooks's mother, Towanda Nobles, was visibly upset. She was crying and stated that she was depressed. Smith testified as follows:
Q. Would you tell the ladies and gentlemenI want you to look at the jury, so that they can hear you and talk loud enough so those folks on the back row can hear you. Tell us what happened. I mean how she got to yourfirst of all, how did she get to your house?
A. Her and Shanta came.
Q. Okay. Did Shanta stay at the house?
A. She stayed there for a few minutes.
Q. Okay. Did Shanta and Towandawell, just tell us what happened.
A. She came in and I was[,] she was sitting down and she told me she needed to talk, she was depressed.
Q. She was what?
A. Depressed.

*692 Q. Okay. How would you describe her, at that time? What was she like, at that time?
A. She was crying.
Q. And what didwould you tell us what she told you?
A. She told me she was depressed. It's done happened.
Q. That something had happened?
A. Uh-huh. And I asked her what happened. And she said she didn't want to talk right now.
Q. Okay.
A. I saidshe grabbed my neck and broke down and went to crying. She said, "She dead." I said, "Who?" And she didn't want to say right then and she said, "Merry."
Q. What happened then, Ms. Hodges?
A. So we just sat around
Q. I'm sorry you have to speak so
A. We sat around. And she was talking. I was talking. And she was crying. I was crying. And then Shanta left.
Q. Okay. Did she tell youwhat, if anything, did she say about Blaine Brooks?
A. She said Blaine did it.
Q. I can't hear you?
A. She said Blaine did it.
Q. Okay. What did she tell you? What did shewhat else did she tell you about what Blaine had done?
A. She said Blaine had stabbed her. Stabbed Merry. Said they got into an argument and Blaine stabbed her. They said Blaine left and come where she was. She was on her job. That Blaine come on her job to tell her about it. And said he had bloody clothes. And she told them to get those bloody clothes out of there and get rid of them. And say he left. And I said where is Blaine now? She say he's gone. He's in Chicago.
¶ 51. At the motion hearing concerning these statements, the trial court ruled this way:
Common sense tells us if we had a child that came to our job, with bloody clothes on, and on top of other bloody clothes, and confessed to stabbing somebody, would be a startling event. The essential element is spontaneity. With respect to the time element, the issue of the duration of the excited statement. On the face of the statement itself, she tells what her condition is. She tells what her sister's condition is. There's no doubt about it being an excited utterance.
No doubt that Towanda Nobles being under the distress of excitement caused by the event. Lord knows what would happen if your daughter or your son came to you on the job and had bloody clothes on and clothes on top of bloody clothes.... Ms. Towanda said that he was very upset and very emotional. Says he's done it again. Mr. Holmes said that details revealed in the statement were consistent with things discovered in the investigation....
I thinkI think it's admissible under the excited utterance exception.... I think it's also admissible under the 803(24) other exception. In view of the time and content of the statement, the circumstances of the event. I think they all provide substantial indicia of reliability to overrule your normal concerns of unsworn hearsay statement. And I make such a finding.
I think it has sufficient guarantee of reliability and trustworthiness.... Certainly there's been no motive, [suggestion] of any motive. It would be normal for a mother, a fairly decent mother to do to her sister, if something of this *693 nature happened.... There'd be no reason for the sister to make such an event or an account up.... So I find that the statement is admissible under 803(2) and (24).
¶ 52. This statement by Maxine Smith of what Nobles said that the Brooks said is hearsay within hearsay. A hearsay statement that recounts the hearsay statement of someone else may be admissible. What is needed is an applicable hearsay exception for each statement: "hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule. . . ." M.R.E. 805
¶ 53. Before setting off on a course of reviewing the hearsay options, I note a new consideration quite recently introduced or perhaps re-emphasized by the United States Supreme Court. Hearsay that qualifies as "testimonial" is barred from admission under the Confrontation Clause of the federal constitution unless the witness making the hearsay statement is unavailable and there was an opportunity at the time of the statement for the defendant to cross-examine. Crawford v. Washington, 541 U.S. 36, 53, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177 (2004). Though the Court avoided giving a list of testimonial hearsay situations, it did base the decision on this core concern:
the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused.... The Sixth Amendment must be interpreted with this focus in mind.
Id. at 1363. What is not admissible are such matters as "ex parte in-court testimony or its functional equivalentthat is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.. . ." Id. at 1364, quoting petitioners brief at 23. Unaffected by the Crawford definition is "nontestimonial hearsay." As to that, "it is wholly consistent with the Framers' design to afford the States flexibility in their development" of hearsay rules. Id. at 1374. As to hearsay that is non-testimonial, the pre-Crawford rules of admitting under exceptions that are "firmly rooted" remain the guiding principles. Idaho v. Wright, 497 U.S. 805, 820-24, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Under Crawford, excited utterances and statements against interest surely are non-testimonial. They also have firm roots. Sarah K. Eddy, "Sixth Amendment at Trial," in "Thirty-First Annual Review of Criminal Procedure," 90 GEO. L.J. 1708, 1726-27 (2002).
¶ 54. Maxine Hodges Smith testified as to what Brooks's mother said about a conversation with her son. Brooks's statement to his mother was one that was against his interest. M.R.E. 804(b)(3). If Brooks's mother had been available to testify, then her report of a conversation in which her son confessed to murder would have been admissible through that exception.
¶ 55. Our question is whether the second-hand report of Brooks's statement is itself admissible through a hearsay exception. Before trial, Brooks was given a hearing on his motion to suppress the Smith statement. One of the exceptions that the trial court applied to deny the motion was the one for excited utterances. That exception covers hearsay "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." M.R.E. 803(2). Smith's testimony described Brooks's mother as "depressed." Whether depression is the opposite of the *694 state of mind required for excited utterances is something that we must analyze.
¶ 56. In evaluating that point, it is important to understand what event needed to be startling to the declarant. It was not the murder itself but the description of it by Brooks to his mother that had to be startling. If so, then whether the mother in later describing what she had been told, remained under the stress of that conversation becomes the second issue. I have no doubt, and the trial judge so found, that it would be startling for most mothers to be told by a son that he had killed someone, that the blood on the clothes that he was wearing was from the victim, and that he needed help in escaping from responsibility for his acts. The hearsay exception for the mother does not need to support the truth that the murder occurred; it only needs to support the truth that the conversation about the murder occurred.
¶ 57. The factual question that I find more difficult is whether Brooks's mother was still excited, or whether by the time of her relating the startling news she had entered a frame of mind that was more contemplative and therefore less trustworthy. The basis for the hearsay exception is the perception, by lawyers and one hopes by those better versed in matters of psychology, that someone under the stress of a startling event is speaking the truth as there is neither temporal nor emotional opportunity to fabricate.
¶ 58. The murder apparently occurred on May 13. It is not clear when Brooks would have had this conversation with his mother, but he apparently was still in the clothes he wore at the time of the murder. It was three days after the killing that the mother told the witness, who was her half-sister.
¶ 59. I do not find the labels of "excitement" and "depression" to be outcome-determinative. The excited utterance rule recognizes an adequate level of trustworthiness that exists because of the stress of a startling event. Yes, "excited" is the nature of the "utterance" covered by the exception, but the lay witness need not speak in those terms. I examine the testimony beyond the labels. What I am searching for is whether the witness at the time of the utterance was still so affected by the stress of the startling event as to be reliably speaking the truth.
¶ 60. When asked about the declarant Nobles, the witness Smith said that Nobles was "depressed." Had Brooks's mother been described as calm, then the issue is resolved against admissibility under this exception. However, the witness added to the label of "depressed" that Brooks's mother was almost uncontrollable, that she broke down crying and grabbed the witness's neck. Regardless of a precise definition of "excite," the description that this witness used for the declarant was of a person having an extremely strong emotional reaction to an event. The word "depressed" in this context described someone who was overwhelmed by the magnitude of what her son related to her.
¶ 61. An evidence treatise captured well what we are seeking in the present case:
When evidence is presented as to the declarant's state of mind or behavior, it is usually because time has elapsed between the event and the statement, and the proponent seeks to establish that the declarant is still under nervous stress when making the statement.
5 WEINSTEINS' FEDERAL EVIDENCE § 803.04[4], at 803-23 (2d ed.2004) (footnote omitted).
¶ 62. For these reasons, I conclude that the witness's use of the word "depressed" does not cancel the possibility of a finding of the kind of excitement meant by the rule.
*695 ¶ 63. More troublesome is the passage of time. I infer that Brooks's mother was recounting a conversation on the same day as the killing since Brooks still had on the bloody clothes. Even if mother and son spoke instead on the next day, there still would have been two additional days that passed before Brooks's mother told Smith that her son had confessed to a murder. Brooks's mother might naturally still be upset when she told Smith, still be overwhelmed in some sense of that word, but it is difficult to find that the necessary evidentiary stress of the startling event operated over such a long passage of time.
¶ 64. What the excited utterance exception requires is that the person be under such a powerful impact of the event that there is no reasonable likelihood of fabrication. Brooks's mother may have been "excited" as Rule 803(2) requires when talking to Smith, but she also needed to have been in that state continually since the conversation with her son, without any time to reflect and concoct. In the two or three days since the exciting event, it is too likely that considerable contemplation occurred. Without some expert testimony that this woman and this event were so exceptional that she had no ability to regain reasoning and therefore ability to fabricate, the startling event was too distant from the declaration. Otherwise, every time someone even months later redescribes an exciting event and again becomes overwrought, such statements would be admissible under the excited utterance exception. The exception is not that expansive.
¶ 65. This does not end the admissibility issue, however. The trial judge also used what is called a "residual hearsay" exception. It permits admission of statements not covered by other exceptions, if the statements have "equivalent circumstantial guarantees of trustworthiness...." M.R.E. 803(24). It is true that the residual hearsay exception is not per se "firmly rooted." Idaho v. Wright, 497 U.S. at 817, 110 S.Ct. 3139. Matters introduced under that exception are "presumptively unreliable and inadmissible under the Confrontation Clause"; in order to be admitted in a criminal case, the statement must possess sufficient guarantees of trustworthiness. Id., 497 U.S. at 818, 110 S.Ct. 3139.
¶ 66. The witness at the suppression hearing who explained what Smith had said, and through whom a typed interview with Smith was offered, was officer Robert Holmes. He stated that Smith believed that Brooks and his mother "were very close and that [Towanda Nobles] would do anything to protect her son." What Smith actually said in the interview on the question of the relationship was that Brooks's mother was "over-protective about her kids." I find that there was as yet only slight sketching of the picture of the relationship between Brooks and his mother.
¶ 67. The trial judge specifically found that the statement was admissible under the residual hearsay exception: "I think it's also admissible under the 803(24) other exception. In view of the time and content of the statement, the circumstances of the event. I think they all provide substantial indicia of reliability to overrule your normal concerns of unsworn hearsay statement. And I make such a finding." The trial judge in explaining his ruling, asked rhetorically "[w]hy would a momma go and tell her sister something like this if it were not true[?] Certainly there's been no motive, suggesting of any motive." The judge concluded "that the statement being offered is sufficiently trustworthy and reliable." At the time of his pretrial ruling, the judge did not have much evidence of the relation between mother and son. This omission was addressed at trial in Smith's *696 testimony. She stated that Brooks and his mother were close, that Mrs. Brooks "love[d] her kids."
¶ 68. It can be seen that the reliability of this particular hearsay springs from the same species of credibility as does a statement against the declarant's interest under Rule of Evidence 804(b)(3). A mother's announcing that a beloved son is guilty of a horrible crime is so far contrary to the personal and emotional interests of the mother that it is an exceedingly credible statement. However, the hearsay exception regarding statements against interest only applies to the declarant's damaging her own "pecuniary or proprietary interest," or creating a risk of her own civil or criminal liability. M.R.E. 804(b)(3). The rationale of the Rule 804(b)(3) exception is that a reasonable person would not make personally harmful statements unless they were true. M.R.E. 804(b)(3) cmt. The exception does not apply when the harm is to a declarant's interest in the welfare of others, perhaps because such interests are too varying to constitute an identifiable class of hearsay. Instead, the considerations that as a general proposition justify a hearsay exception when the pecuniary or criminal interests of the declarant are directly undermined, may be applied on a casespecific basis to the equally strong interests that may exist to avoid harm to close family members. Admission of such testimony is possible under the residual hearsay rule if "equivalent circumstantial guarantees of trustworthiness" can be shown. M.R.E. 803(24).
¶ 69. The substantive requirements for residual hearsay are these:
(A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purpose of these rules and the interests of justice will best be served by the admission of the statement into evidence.
M.R.E. 803(24). Brooks does not dispute that the State gave the needed notice under the rule.
¶ 70. Since this is a criminal case, the trial judge must also find that the statement has sufficient guarantees of trustworthiness, based on the "totality of the circumstances ... that surround the making of the statement and that render the declarant particularly worthy of belief." Idaho v. Wright, 497 U.S. at 817, 110 S.Ct. 3139. The totality of circumstances here include details about the relationship that Nobles had with her son, such as whether it was sufficiently close and supportive as to make so damning a statement by Nobles to her half-sister a reliable one. What evidence there was, from Smith at the trial itself, supported that mother and son were quite close and a statement such as this would be a reliable one. The fact that the evidence only came in at trial, when there was none at the time of the ruling on suppression, is unimportant on appeal. Smith's testimony at trial confirmed with evidence what the investigator had described during the suppression hearing. On appeal, we are to examine the entire record to determine whether there was sufficient evidence to justify the ruling.
On appellate or collateral review we look to the objective record. We limit our look to proof in the accused's presence. We ask not what facts the sentencing judge knew but what facts were available and in the record or otherwise before the court.
Corley v. State, 585 So.2d 765, 768 (Miss. 1991) (sufficiency of evidence of facts for guilty plea). Looking at this entire record, there was adequate proof that Brooks's mother was exceedingly credible if she said that her son had confessed to her that he was guilty of murder.
*697 ¶ 71. There may be reasons to doubt the veracity of a witness who says that she heard Brooks's mother say these things. Brooks's attorney was persistent in questioning Smith about her own motives to fabricate and about inconsistencies with prior explanations that she had given to law enforcement officers. What is less plausible is to doubt the trustworthiness of the statement itself, should the jury find that Brooks's mother actually said these things.
¶ 72. We review a trial judge's admission of evidence for whether an abuse of discretion occurred. Whitten v. Cox, 799 So.2d 1, 13 (Miss.2000). The judge was within his discretion to determine that Smith's account of what Brooks's mother said had sufficient guarantees of trustworthiness. Smith was the person to whom Brooks's mother was speaking, so Smith's testimony was direct evidence and not hearsay of what Brooks's mother had said. The statement was admissible.
THOMAS AND GRIFFIS, JJ., JOIN THIS SEPARATE WRITTEN OPINION.